LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB # 3586
Chief of Civil Litigation

MICHAEL S. GILMORE, ISB # 1625
Deputy Attorneys General
Statehouse, Room 210
P.O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-4130
Facsimile:  (208) 854-8073
mike.gilmore@ag.idaho.gov

MARK A. KUBINSKI, ISB #5275
Lead Deputy Attorney General
Idaho Department of Correction
1299 N. Orchard Street, Suite 110
Boise, ID 83706
Telephone: (208) 658-2097
Facsimile: (208) 327-7485
mkubinsk@idoc.idaho.gov

THOMAS C. PERRY, ISB #7203
Counsel to the Governor
Office of the Governor
P.O. Box 83720
Boise, ID  83720-0034
Telephone:  (208) 334-2100
Facsimile:  (208) 334-3454
tom.perry@gov.idaho.gov

Attorney for Governor Otter

Attorneys for IDOC Defendants

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| THE ASSOCIATED PRESS, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> C.L. (BUTCH) OTTER, *et al.*, <br><br> Defendants. | Case No. 1:12-cv-00255-EJL <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2** |

Defendants (1) Governor C.L. (Butch) Otter, (2) Idaho Board of Correction Members Robin Sandy, Howard G. "J.R." Van Tassel, and Jay L. Nielsen, (3) Idaho Department of Correction ("IDOC") Director Brent Reinke, and (4) Idaho Department of Correction Division Chief of Operations Kevin Kempf, collectively Defendants or IDOC, all of whom have been sued in their official capacities, file their Defendants' Opposition to Plaintiffs' Expedited Motion for Preliminary Injunction, Dkt. No. 2.

# I. FACTUAL BACKGROUND

For purposes of this Opposition, Defendants accept the following allegations of fact in Plaintiffs' Complaint:  On November 18, 2011, the State of Idaho executed a death warrant against Paul Ezra Rhoades.  Both before and after that date there was correspondence among IDOC officials and representatives of the news media concerning when in the execution process Mr. Rhoades would become visible to official witnesses.  See Complaint Ex. A-F, Dkt. 1-1. IDOC officials met with representatives of the news media on January 24, 2012, to discuss IDOC procedures on that very issue.  IDOC and the news media did not come to any agreement.[1] Regarding when an execution will become visible to official witnesses, IDOC has in substance the same procedure used in November 2011 and that is posted on line as most recently reviewed on January 6, 2012.  A copy of that procedure, formally known as IDOC Standard Operating Procedure 135.02.01.011 (version 3.6) ("SOP 135"), is Ex. 1 to the Declaration of Jeff Zmuda, Deputy Chief of the Bureau of Prisons of the Idaho Department of Correction ("Zmuda Decl.").

Defendants add the following facts that they believe are uncontested:  On May 17, 2012, District Judge Shindurling issued a death warrant for Mr. Richard A. Leavitt to be executed on June 12, 2012.  On May 22, 2012, almost five months after the news media met with IDOC officials and twenty-one days before the scheduled execution, Plaintiffs filed suit and moved for a preliminary injunction.  Dkt. Nos. 1 and 2.  Plaintiffs did not serve the Complaint or the Motion on any Defendant on May 22.  It was not until two days later—on May 24, following the District Court's Order to serve the Plaintiffs, Dkt. 5, p. 3, and nineteen days before the scheduled execution—that Plaintiffs first delivered the Complaint and the Motion to the Attorney General's office.  The May 22 Complaint and Motion do not challenge any new procedures, but challenge a part of the IDOC witness protocol that has been in place since before the Rhoades execution.

---

[1]  Complaint ¶ 32, Dkt. 1, states:  "Contrary to Defendants' assurances, a review of the execution protocol followed by the IDOC has not occurred. Defendants, in fact, have refused to modify the protocol in any respect."  Defendants disagree with the first sentence.  IDOC reviewed the protocol and retained it. Zmuda Declaration, ¶ 5.  A commitment to review the protocol is not a commitment to change it

## II.  GOVERNING LEGAL STANDARDS

**A.    Applicable Preliminary Injunction Law**

The Brief in Support of Plaintiffs' Expedited Motion for Preliminary Injunction ("MPI Brief"), Dkt. 2-1, p. 3, cites *Farris v. Seabrook*, — F.3d —, 2012 WL 1194154, *4 (9th Cir. April 11, 2012), and *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  *Farris* says: "A plaintiff seeking a preliminary injunction must show that:  (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor and (4) an injunction is in the public interest."  *Farris*, at *4.  This is black letter preliminary injunction law that Defendants accept.

Plaintiffs then add:  "The plaintiffs do ***not*** have to show that they are likely to succeed if the balance of equities tips sharply in their favor and there are serious questions going to the merits," citing *Farris* at *4 (emphasis added).  MPI Brief, Dkt. 2-1, p. 3.  Plaintiffs' quotation is faithful to *Farris*, but *Farris* is not faithful to *Winter*.  *Winter* says:  "A plaintiff seeking a preliminary injunction ***must*** establish that he is likely to succeed on the merits … ."  555 U.S. at 20 (emphasis added).  *Winter* has no exception for serious questions going to the merits.

**B.    Plaintiffs' Burdens of Proof and Persuasion**

Rather than assuming the burden of proof placed upon them by *Farris* ("A plaintiff seeking a preliminary injunction must show …"), Plaintiffs cite *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), for the proposition that if they make a colorable claim that their First Amendment rights have been infringed, or are threatened with infringement, the State bears the burden of justifying any law that may restrict First Amendment freedoms.  That may be the rule in the ordinary First Amendment case, but this is no ordinary case.  This case involves prisons and prison procedures.

As the Ninth Circuit recognized in *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (2002) (*CFAC IV*), prison cases are not analyzed like cases dealing with public meetings or hearings:  "Because the executions … take place within prison walls, are administered by the same individuals who run [the prison] and are staffed by the same personnel who

participate in the daily operations of the prison, our level of scrutiny must be guided by the line of cases addressing constitutional challenges to prison regulations, rather than by those governing access to governmental proceedings." *Id.* at 877. *CFAC IV* continued that the standard "in reviewing a challenge to a prison regulation that burdens fundamental rights [is] to ask whether the regulation is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns." *Id.* at 878. As *California First Amendment Coalition v. Calderon*, 150 F.3d 976 (9th Cir 1998) (*CFAC III*), explained in reversing and remanding a summary judgment entered without an evidentiary hearing, the burden of proof was on the plaintiff news organizations: "We do not have substantial evidence indicating an exaggerated response here and, therefore, defer to prison officials in this matter. … [¶] Accordingly, we reverse and remand this action to the district court with instructions to determine whether the Coalition has presented 'substantial evidence' that [the California procedure] represents an exaggerated response to [the California Warden's] security and safety concerns." 150 F.3d at 983.

Moreover, the press has no right of access to prisons superior to the public in general. "[T]he press has no First Amendment right to view events inside prison walls" as such; the press has "a right [that] is co-extensive with the public's right to the same information." *CFAC IV*, 299 F.3d at 874. Thus, Plaintiffs' rights in this case are no more than the rights of any citizen.

### III.  IDOC'S LEGITIMATE PENOLOGICAL OBJECTIVES

**A.     Idaho Does Not Have England's or California's Histories**

Whatever the history of public executions in England from 1196 to 1868, *CFAC IV*, 299 F.3d at 875, and whatever the history of public witnesses at the gas chamber in California in the twentieth century, *id.* at 876, Idaho has no comparable history that it is stepping back from, and Idaho should not be burdened with either of these histories. Unlike California, which according to *CFAC IV* has by statutes going back to 1858 required at least "twelve respectable citizens" to witness all executions, *id.* at 875-876, the State of Idaho had no comparable statutory policy in the twentieth century. The word "witness" does not appear at all in current Idaho Code Title 19, Chapter 27, which governs execution of a judgment of death. Nor, so far as Defendants can

research the issue in the short time in which their Opposition is due, has Idaho provided by statute for witnesses to an execution at any time since Idaho replaced hanging with lethal injection in 1978 Idaho Session Laws, ch. 170, p. 140.[2]

California's historical practice, which was recited in detail in Part I.B of *CFAC IV's* Analysis, 299 F.3d at 875-876, was an important factor in the Ninth Circuit's decision. The historical practices and traditions in California, including the statutory requirement of witnesses to the execution and the historical practice of witnesses being present to watch the condemned enter the gas chamber, satisfied one of the prongs of the *Richmond Newspaper* test that the Ninth Circuit used to determine that California executions must be open to witnesses from the time the condemned enters the execution chamber. *Id.* at 877. If the Ninth Circuit intended to constitutionalize the consequences of California's practice and history on other States, it did not say so in *CFAC IV*. *Cf. Perry v. Brown*, 671 F.3d 1052, 1096 (9th Cir. 2012) (withdrawal of a previously enjoyed right in one State is on a different constitutional footing than whether other States that have never provided the right at all). Thus, Idaho is entitled to write on a clean slate unencumbered by California's practice and history.

Idaho has administered the death penalty only twice since the 1960s. IDOC has a legitimate penological objective in approaching its administration of the death penalty according to its evolving standards of decency that call for quiet professionalism. In particular, IDOC has a legitimate penological objective in removing the spectacle that accompanied "town square" executions and implementing its own standards of decency.

B.  **Idaho Provides Affirmative Evidence of Legitimate Penological Objectives for Its Witness Procedure**

Plaintiffs have failed their obligation to offer evidence that the Idaho procedure is an exaggerated response to Idaho's legitimate penological objectives. The Complaint is verified, see Dkt. 1, p. 19, but it does not offer evidence regarding Idaho's penological objectives; rather, it eschews such considerations entirely: "[T]he singular issue before this Court is whether or not

---

[2]  Defendants will continue to research this issue after filing this Opposition. If this statement is in error, they will promptly notify the Court.

the execution process – including the preparatory phase – should be opened for viewing." Dkt. 1, pp. 9-10. Further, Plaintiffs provided no declarations or affidavits in support of their Expedited Motion for Preliminary Injunction (the MPI). The absence of evidence alone is reason to deny the MPI and to set this case on a normal timetable for an evidentiary hearing.

Defendants, however, do not stand on their procedural right to demand that Plaintiffs first produce evidence. They affirmatively offer evidence even though they are under no obligation to do so before Plaintiffs step forward. Defendants articulate the following legitimate penological objectives for their witness protocol, none of which were addressed in *CFAC IV*:

***First***, IDOC has a legitimate penological objective in preserving the condemned inmate's right to privacy during as much as possible of his final conscious moments. Few of us know with certainty when or how we will die. If we did, would we want our full gamut of emotion, or our contemplation of eternity or cessation of existence, or our regret or defiance, on display? Or would we prefer some final, private moments during the arrangements for the execution before the curtain is opened? Defendants cannot say with certainty that each man or woman who will face the death penalty may wish for privacy as they are outfitted with the catheters that will deliver fatal chemicals or await the outcome of a possible delay, but it is legitimate for Idaho to offer them that solace and dignity. See Declaration of Idaho Maximum Security Institution Warden Randy Blades, ¶ 4 ("Blades Decl.")

Further imagine what would have been on display if the facts of the Rhoades execution last November had changed only slightly. On that day there was a 55-minute delay to await the outcome of a last-minute, State-Court attempt to stop the execution by an attorney who did not even represent Mr. Rhoades. Mr. Rhoades was still in his cell when the delay occurred. This was a period of tension and anxiety for all involved. Blades Decl., ¶ 9. But not long afterward Mr. Rhoades would have been in the execution chamber, where he could have been exposed to all witnesses as he agonized over whether the process would continue or stop.

***Second***, IDOC has a legitimate penological objective in considering how an extended witness period may affect other death row inmates. Warden Blades has participated in discus-

sions with death row inmates and believes that an extended witness period will adversely affect those inmates because they do not want their executions to become sensationalized or to become spectacles themselves. They are concerned about effects of the reporting of their last moments upon their families and friends and upon other Death Row inmates. Blades Decl., ¶¶ 5-6.

*Third*, IDOC has a legitimate penological interest in shielding the family and friends of the condemned inmate from the public suffering that the inmate might incur during extended witness periods or delays in the execution process. The Department has reached out and will reach out to family members of condemned inmates who wish to share visitation in the days leading up to the execution, who wish to witness the execution or to be on site during the execution, or who wish to claim the remains after the execution. Family members have not been convicted of a capital offense, and the Department has an interest in minimizing the public exposure of the condemned inmate that must be endured by their loved ones. Both Mr. Rhoades's and Mr. Leavitt's mothers want their sons to be afforded as much dignity as possible during their final moments and to minimize their time of public scrutiny. Blades Decl., ¶ 7.

*Fourth*, IDOC has a legitimate penological interest in shielding the members of its Medical Team from public exposure as they insert the catheters, etc. It is common human experience that surgical masks do not hide all identifying features. Height, weight, skin and hair color, body types, and other characteristics can be distinctive and increase the chances of identification. Every moment that the Medical Team is on display increases the chances of identification. Medical Team members come from the community. Confidentiality of their identities and their anonymity is of paramount importance to them and to IDOC. Extended public display will increase the difficulty of recruiting or retaining Medical Team members. It will also require a last-minute change in their training, which is already underway. Zmuda Decl., ¶¶ 6, 9.

Further, IDOC has a legitimate penological interest in shielding the Medical Team from possible anxiety and stress of performing an ordinary medical procedure (the insertion of a catheter) before an audience knowing that a delay or mishap will be reported, Blades Decl., ¶ 11, and that a delay or mishap may increase the possibility of Medical Team members being identified.

### IV.  PLAINTIFFS HAVE NOT MET THE STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

**A.     Plaintiffs Have Not Shown That They Are Likely to Succeed on the Merits**

The first prong of the Supreme Court's four-part *Winter* test for issuing a preliminary injunction is that Plaintiffs must show they are likely to succeed on the merits.  As noted before, Plaintiffs offer no evidence and thus prove nothing regarding whether IDOC seeks to implement its articulated penological objectives through exaggerated responses.  The MPI Brief never further addressed the *Winter* test.  Instead, Plaintiffs put all of their eggs in the contra-*Winter* formulation of the balance of equities tipping sharply in their favor and there being serious questions going to the merits.  MPI Brief, pp. 3-4.

Defendants are the only parties who have yet produced any evidence regarding IDOC's penological objectives.  *CFAC III* gives Plaintiffs the burden of showing that IDOC seeks to implement its legitimate penological objectives through exaggerated responses.  Until Plaintiffs produce evidence to that effect, they have *no* likelihood of success.  As the Ninth Circuit stated in *CFAC III*:  "We do not have substantial evidence indicating an exaggerated response here and, therefore, defer to prison officials in this matter."  150 F.3d at 983.

**B.     Plaintiffs Have Not Shown That They Are Likely to Suffer Irreparable Harm**

Plaintiffs' entire argument on the issue of showing irreparable harm without a preliminary injunction is one paragraph containing generalities inapposite to the issues before the Court:

> "[A]n alleged constitutional infringement will often alone constitute irreparable harm."  *Associated Gen. Contractors of Cal. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) [*cert. denied* 503 U.S. 985 (1992)] citing *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984).  In particular, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and that "harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as 'timing is of the essence in politics' and '[a] delay of even a day or two may be intolerable.'"  *Thalheimer* [*v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011)] (internal citations omitted).

MPI Brief, p. 4, Dkt. 2-1.

Plaintiffs' cases cast little light on the issue before the Court. *Associated General Contractors* involved an equal protection challenge to a city ordinance that preferred minority contractors. 950 F.2d at 1403-1405. The Court stated that allegations of constitutional harm can give rise to a presumption of irreparable harm, but more is needed for a preliminary injunction: "[W]hether or not AGCC would be entitled to such a presumption [of irreparable harm], the organization has not demonstrated a sufficient likelihood of success on the merits of its constitutional claims to warrant the grant of a preliminary injunction." *Id.* at 1412. For this and other reasons the Ninth Circuit affirmed denial of a preliminary injunction. *Id.* at 1418.

*Goldie's* involved an equal protection challenge to a State-court proceeding in which a lessee used California's unlawful detainer statutes to evict a sublessee. 739 F.2d at 467-468. While acknowledging that a constitutional infringement may constitute irreparable harm, the Ninth Circuit reversed the District Court's grant of a preliminary injunction to the sublessee for reasons that included the sublessee's failure to produce evidence of harm. *Id.* at 472.

*Thalheimer* was a challenge to a city ordinance limiting the amount of money that could be spent and raised by independent campaign committees. 645 F.3d at 1113-1115. *Thalheimer* dealt with core First Amendment concerns associated with political speech at election time, not with the balance between prison protocols and the general public's access to information about the prison's operations. *Thalheimer* does not apply to the question before the Court.

The cases most directly on point concerning how this Court should view the issue of irreparable injury are *CFAC III* and *CFAC IV*. *CFAC III* reversed the District Court's grant of a final injunction and remanded the matter for trial. 150 F.3d at 983. As *CFAC IV* recounted, the California procedure at issue in *CFAC III* and *IV* remained in effect from the time of *CFAC III's* remand in July 1998 through the District Court's trial on the merits and until the District Court's post-trial issuance of a new injunction in July 2000. During those twenty-four months four executions took place under the procedure that was later enjoined. 299 F.3d at 872. This history is a strong indication that when there are contested issues of fact concerning execution procedures and when those execution procedures are defended as based upon legitimate penological

objectives, Plaintiffs cannot show a likelihood of irreparable harm without meeting their burden of proof at a hearing on the merits.

Further, proof of the likelihood of irreparable harm is required before a preliminary injunction may issue. *Winter* states:

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction. … A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

555 U.S. at 22 (citations and internal punctuation omitted).

Nothing in the record now before the Court shows that Plaintiffs are likely to incur irreparable injury. The balance between prison procedures and public access to information within the prison tips in IDOC's favor unless and until Plaintiffs prove that IDOC's procedures are an exaggerated response. Plaintiffs have not even attempted such a showing, so they have not demonstrated a likelihood of irreparable injury.

C.   **The Balance of Equities Is In Defendants' Favor**

Plaintiffs' MPI Brief does not address the balance of equities after it cites the balance as a prong of the *Farris* and *Winter* tests. MPI Brief, Dkt. 2-1, p. 3. There is no equity in entertaining Plaintiffs' eleventh-hour MPI.

Let us recap the events preceding the MPI Motion. IDOC has the same witness protocol used last November 2011. IDOC retained this protocol after meeting with representatives of the media on January 24, 2012, and informing the media on February 1, 2012 that it would retain the protocol. Complaint, Dkt. 1, p. 8. Further, Plaintiffs allege at Complaint ¶¶ 20-21, and Defendants agree, that the issue of the witness protocol is both ripe and not moot.[3] That is because

---

[3] Defendants realize that parties cannot confer jurisdiction on the Court by stipulating that an issue is not moot. See *Powell v. McCormack*, 395 U.S. 486, 500, n.15 (1969). Nevertheless, they inform Plaintiffs and the Court that they will not contend under current circumstances that the issue of IDOC's protocol will become moot if Mr. Leavitt is executed as scheduled on June 12, 2012.

there are other Death Row inmates nearing the end of their appeal and habeas processes. Idaho Code § 19-2705(1) (2004) requires a death warrant to be executed within thirty days of issuance. This creates a timeline that is capable of repetition and evading review for issues regarding the witness protocol used to implement the death warrant.

Given that IDOC's letter of February 1, 2012, continued to make the issue of the IDOC's witness protocol both ripe and not moot, there are no equities in Plaintiffs' favor when they delayed filing the Complaint and MPI until May 22, 2012, and further delayed serving them until ordered to do so by the Court on May 24, 2012. *CFAC III* and *CFAC IV* show that California's witness protocol was not enjoined until after a full trial on the merits because the starting point for analysis is that a prison protocol that serves legitimate penological objectives stays in place until a challenger proves that the protocol is an exaggerated response to the objectives. The equities favor Defendants. As the Supreme Court explained in a death penalty case in which a condemned inmate may have unnecessarily delayed bringing a claim against a death penalty protocol, equity must take into account the failure to act promptly, and there is a strong equitable presumption against granting a stay or a preliminary injunction when the claim could have been brought in time to allow consideration of the merits without a stay or preliminary injunction:

> A stay is an equitable remedy, and equity must take into consideration the State's strong interest in proceeding with its judgment and attempts at manipulation. Thus, before granting a stay, a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim. Given the State's significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.

*Nelson v. Campbell*, 541 U.S. 637, 649-650 (2004) (citations and internal punctuation omitted).

The principle that *Nelson* applied to a prisoner subject to a death penalty protocol should apply no less to Plaintiffs seeking to challenge a witness protocol—there is a strong equitable presumption against granting a preliminary injunction when Plaintiffs' claim could have been

brought in time to allow consideration of the merits without a preliminary injunction.

**D.      There Is a Public Interest in Denying the Expedited MPI**

Plaintiffs argue "[t]here is a significant public interest in upholding First Amendment principles." MPI Brief, p. 4, Dkt. 2-1. That is undoubtedly true, but Plaintiffs put the cart before the horse. *CFAC III* teaches that it takes an evidentiary hearing to determine the balance between First Amendment principles and legitimate penological objectives and that First Amendment principles in the abstract do not trump legitimate penological objectives without a hearing.

Further, there is a strong public interest in States enforcing their criminal judgments. *Nelson*, 541 U.S. at 649-650. Plaintiffs say they do not intend to interfere with that interest: "Plaintiffs are not seeking an injunction delaying the execution itself." Complaint, ¶ 37, Dkt. 1.

> It should also be noted that the request for the preliminary injunction herein does not relate to going forward with the execution, but only to the viewing of the execution in full inclusive of the execution process beginning with entry into the execution chamber. The State of Idaho is going to be hard pressed to argue that some type of irreparable harm is going to occur given the fact that the extent of the request herein is simply that a full viewing of the execution process be allowed.

MPI Brief, p. 3.

Plaintiffs' statements make it seem that the MPI is completely disconnected from the execution going forward, but they ignore the elephant in the room. At this stage of the process, any change in the execution protocol may invite a challenge from Mr. Leavitt that would delay the execution. *Cf. Lopez v. Brewer*, — F.3d —, 2012 WL 1693926 (9th Cir. May 15, 2012) (lamenting Arizona's changing death penalty protocols and the litigation that ensued). Defendants have an understandable reluctance to change the protocol at this time and thus to provide a rationale for Mr. Leavitt to challenge it.

Lastly, Plaintiffs refer to the "public interest," MPI Brief, pp. 4-6, Dkt. 2-1, and assume that their view represents the public interest. Again, they lack any evidentiary basis for that. California had a statute and a historical practice and tradition that in part defined the public

interest in California. See *CFAC IV*, 299 F.3d at 876.[4] Idaho does not have similar statutes or traditions. Plaintiffs offer no evidence that Idaho's different statutes, practices and traditions define the public interest in the same manner as California's. In fact, Idaho's statutes, practices and traditions are inapposite to California's and strongly suggest there is no public interest in changing Idaho's witness protocol. The best indicators of Idaho's public interests are its statutes, practices and traditions. Plaintiffs offer nothing in opposition to them.

## V. SUMMARY: THE EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

Plaintiffs have failed to meet their evidentiary burdens articulated by *CFAC III* to show that Defendants' witness protocol is an exaggerated response to legitimate penological objectives. Plaintiffs have not shown a likelihood of success on the merits, a likelihood of irreparable harm if they do not receive preliminary relief, a balance of equities in their favor, or that the public interest supports their position.

That should be the end of the matter and their MPI should be denied. Further, even if Plaintiffs had made a stronger showing, injunctive relief is always discretionary. There is no right to injunctive relief, particularly to a preliminary injunction, even if a movant may later succeed on the merits. "An injunction is a matter of equitable discretion; it does not follow from

---

[4] The Court's enunciation of the public interest in *CFAC IV* was shaped by California statutes, tradition and practice:

> … Currently, in addition to the 12 official witnesses who attend California executions, 17 news media witnesses are also invited. Thus, there is a tradition of at least limited public access to executions.
>
> ….
>
> … The public and press historically have been allowed to watch the condemned inmate enter the execution place, be attached to the execution device and then die. As we noted in *California First Amendment III*, before California adopted the lethal gas method of execution, witnesses were permitted to view hangings "in their entirety, from the condemned's ascent up the gallows to the fall of the trap door." 150 F.3d at 978. Thereafter, witnesses were also permitted to observe lethal gas executions "from the time the condemned was escorted into the gas chamber until pronouncement of death." Id. Accordingly, historical tradition strongly supports the public's First Amendment right to view the condemned as the guards escort him into the chamber, strap him to the gurney and insert the intravenous lines.

299 F.3d at 876.

success on the merits as a matter of course. A federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Winter*, 555 U.S. at 32. "For the reasons stated [failure to prove likelihood of irreparable harm], we find the injunctive relief granted in this case an abuse of discretion, even if plaintiffs are correct on the underlying merits." *Id.* at 31, n.5.

This is a good case to take *Winter's* admonitions to heart. The equitable remedy that Plaintiffs seek should not be given without a fully developed evidentiary record, not one hurriedly put together to meet the timetable of a preliminary injunction hearing in the two weeks between filing this Opposition and the scheduled execution date of June 12, 2012. There will be ample time to develop the record after that; there would have been ample time to develop the record if Plaintiffs had filed in February. Instead, Plaintiffs filed their Complaint and Motion at the eleventh hour, a practice criticized in *Nelson* and lamented in *Lopez*. Even if Plaintiffs were eventually to succeed on the merits (Defendants do not believe that they will), this case, like *Winter*, is a poor one in which to rush to injunctive relief because of the likelihood that it will short circuit the development of an evidentiary record and the likelihood that it will provide more grounds to challenge the underlying execution.

DATED this 29th day of May, 2012.

        STATE OF IDAHO
        OFFICE OF THE ATTORNEY GENERAL


        By  /s/ *Michael S. Gilmore*
             MICHAEL S. GILMORE
             Deputy Attorney General

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of May, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Charles A. Brown
Attorney at Law
CharlesABrown@cableone.net

Thomas C. Perry
tom.perry@gov.idaho.gov

    /s/ *Michael S. Gilmore*
Michael S. Gilmore
Deputy Attorney General