Charles A. Brown
Attorney at Law
324 Main Street
P.O. Box 1225
Lewiston, ID 83501
208-746-9947
208-746-5886 (fax)
ISB # 2129
CharlesABrown@cableone.net
Attorney for Plaintiffs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| THE ASSOCIATED PRESS, et al., | ) | Case No. 1:12-cv-00255-EJL |
| | ) | |
| Plaintiffs, | ) | PLAINTIFFS' RESPONSE TO |
| | ) | DEFENDANTS' OPPOSITION [DKT 8] |
| v. | ) | TO EXPEDITED MOTION FOR |
| | ) | PRELIMINARY INJUNCTION [DKT 2] & |
| C.L. (BUTCH) OTTER, et al., | ) | STATUTORY SUPPLEMENT TO |
| | ) | DEFENDANTS' OPPOSITION TO PLS' |
| Defendants. | ) | MPI, DKT. NO. 2 [DKT 11] |

COME NOW the plaintiffs in this matter by and through their attorney of record, Charles A.

Brown, and hereby respond to the defendants' opposition [Dkt 8] to the plaintiffs' Expedited Motion

for Preliminary Injunction [Dkt. 2] and the Statutory Supplement to Defendants' Opposition to

Plaintiffs' Expedited Motion for Preliminary Injunction, Dkt. No. 2 [Dkt 11] as follows:

## I. - PREAMBLE

The facts of this case are admitted by both parties, and are the focus of the complaint and

the motion for preliminary injunction. The IDOC standard operating procedure for executions

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 1

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

prevents the viewing of the initial phase of the execution (approximately 20 minutes). It is also admitted that a protest was made prior to the Rhoades execution in regard to exactly that issue.

The Department of Corrections indicated they would review their protocol in that regard but did not want to concern themselves with it during the Rhoades execution.

After the Rhoades execution they apparently reviewed their protocol and have not changed it. A complaint in the above-entitled matter was filed at 5:09 p.m. PDT on May 22, 2012, as well as the unissued summons, just three (3) business days after the execution of Mr. Leavitt was ordered on May 17, 2012 (a Thursday). The motion for the preliminary injunction was filed at 6:18 p.m. PDT on May 22, 2012. On May 23, 2012, the summonses were issued by the Clerk of the above-entitled court. The above-entitled court also issued an Order ordering mediation and setting forth a briefing schedule. That Order was then included with the complaint, summons, motion, and brief and were emailed to the process server in Boise, Idaho, on the morning of May 24, 2012. The process server had to print six (6) sets of the above-referenced documents and then serve. Service was made at 3:40 p.m. PDT on May 24, 2012. An expedited service fee was paid in order to have the service made on the same date of delivery to the process server.

The speed of the Plaintiffs in filing a complaint, which had to meet the "well-pleaded complaint rule", and also the responsiveness of the above-entitled court, is nothing less than remarkable. Any implication of delay alleged by the Defendants is unsupported.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 2

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

## II. - GOVERNING LEGAL STANDARDS

**A.      Applicable Preliminary Injunction Law**

The Plaintiffs are likely to succeed on the merits, but more importantly that the merits of the preliminary hearing injunction are, indeed, the merits of the case as a whole. The Defendants have argued that there are penological interests that override all other considerations but such a stance is not supported by the case law.

The Plaintiffs also assert that they will suffer irreparable harm in the absence of preliminary relief. The Defendants have already admitted that they had an opportunity to review its protocol before the Rhoades execution, but chose not to change that protocol for the Rhoades execution. Thereafter, they indicated they had reviewed the protocol and chose not to change the protocol in regard to the Leavitt execution. So now, this time with regard to the Leavett execution, which is the focus of the complaint herein, the State will again prevent Plaintiffs from viewing the initial phase of the execution process. It is interesting to note that the Defendants do not assert that they will suffer any type of harm if the injunction is granted. Instead, they discuss the sensitivities of Mr. Leavitt and other prisoners on death row, but certainly the events during the execution process prior to the actual injection of the lethal dose cannot be more unsettling than the actual death of the condemned himself.

Given the fact that the Defendants had over five (5) months to change their protocol in order to conform with existing law in the Ninth Circuit and has consciously chosen not to do so, the equities in this matter are strongly in the Plaintiffs' favor. The strength of the Plaintiffs' position in this matter is compelling.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 3

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

An injunction is in the public's interest because of the public's right to know all details of an ultimate expression of supreme governmental authority in our society that is the taking of the life of a human being.

**B.      Burdens of Proof and Persuasion**

Strict scrutiny applies to content-based restrictions of fundamental First Amendment rights. As to the rights essential to individual liberty in our society, fundamental rights include all rights encompassed under the First Amendment.  In the context of the First Amendment, the Ninth Circuit treated the question of the public's right to view the execution of a condemned prisoner, utilizing a two-part approach applied by the Supreme Court.  *Woodford*, 299 F.3d at 875 citing *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8-9, 106 S. Ct. 2735 (1986).  It evaluated "(1) 'whether the place and process have historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular process in question.'"  *Id.* The Ninth Circuit summarized that "[t]he Supreme Court's two-pronged test leads us to conclude that the public has a First Amendment right to view executions."  *Woodford*, 299 F. 3d at 875. Axiomatically, then, this First Amendment right to view qualifies as one that is fundamental in nature.

Fundamental liberties are deemed so critical to a free society that they may not be impaired by government action unless such action is motivated by a compelling government interest. Transgressions against fundamental rights are typically evaluated under strict scrutiny analysis.  Yet government restrictions within the realm of free speech, which encompasses the right to view, may be either content-based or content neutral.  "Deciding whether a particular regulation is content based or content neutral is not always a simple task.  We have said that the 'principle inquiry in

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8]  TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 4

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). And, to be sure, "not every interference with speech triggers the same degree of scrutiny under the First Amendment." *Id.* at 637.

So, the quality of the particular interference in so far as neutrality, or lack thereof, determines the appropriate level of applicable scrutiny. "[A]bove all else, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972) citing *Cohen v. California*, 403 U.S. 15, 24 (1971); *Street v. New York*, 394 U.S. 576 (1969); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964), and cases cited; *NAACP v. Button*, 371 U.S. 415, 445 (1963); *Wood v. Georgia*, 370 U.S. 375, 388-89 (1962); *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949); *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). Censorship is chiefly motivated by content control. *Id.* at 96. "Any restriction on expressive activity because of its content would completely undercut the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust and wise-open [sic].'" *Id.* quoting *New York Times Co.*, 376 U.S. at 270. "Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991) (Kennedy, J., concurring); *Consolidated Edison Co. of N.Y. v. Public Serv. Commn. of N.Y.*, 447 U.S. 530, 536 (1980); *Mosley*, 408 U.S. at 95. Strict scrutiny, then, applies to a government transgression against a fundamental, First Amendment right only where expressive activity is restricted based on content.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 5

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

Because IDOC Standard Operating Protocol 135 constitutes a content-based restriction on the live viewing of the execution process, the regulatory provision is subject to strict scrutiny review. The IDOC offers no compelling or overriding justification grounded upon any articulated concern over the internal order and security of the prison system that would warrant the promulgation and implementation of the Protocol. Similarly, the IDOC offers no legitimate penological interest grounded upon any articulated concern over the internal order and security of the prison system that would warrant continued application of the Protocol. Not only is IDOC Standard Operating Protocol 135 presumptively invalid, it patently violates the fundamental First Amendment freedom of every unincarcerated citizen of Idaho to view the entirety of a state-sanctioned execution process designed to achieve justice for all people in this state.

## III. - DISCUSSION OF PENOLOGICAL OBJECTIVES

**A.    Idaho's History Inclusive of Discussion of States Supplemental Statutory Brief Filed May 30, 2012**

The Plaintiffs herein are alleging that a violation of the First Amendment of the United States Constitution has occurred during the Rhoades execution and will obviously reoccur during the Leavitt execution, if not prevented by a order of a federal court. The Plaintiffs are not seeking to interpret the First Amendment to the Idaho Constitution nor the California Constitution, and the interpretation of the First Amendment to the United States Constitution should not rest upon an *ad hoc* analysis of what the Defendants perceive to be the history of executions in the State of Idaho.

The Plaintiffs herein have filed a verified complaint. Even though the Defendants have filed two affidavits that rely upon hearsay and allegations without appropriate foundation, Plaintiffs complaint is essentially uncontroverted.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 6

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

Plaintiffs' verified complaint in ¶ 25. alleges an openness to executions historically which was discussed and ruled upon by the Ninth Circuit Court in *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 3 Med. L. Rptr. 2345 (9th Cir. 2002).

The Defendants have provided a Statutory Supplement which argues or at least implies that after 1899 executions in Idaho were ". . . closed from public view within the walls of the state penitentiary . . ." but actual history speaks otherwise.  If the Defendants had perused its own archives it would have found differently.

Idaho has a long and consistent history of media witnesses attending its state executions to serve as the eyes and ears of the public. In fact, only one execution in the state's history did not have news media witnesses present; that was a hurry-up double hanging held in the middle of the night in 1951 by a frightened prison warden who feared inmate riots and, as a result, had all traces of the gallows removed by morning.

Before 1901, executions in Idaho were held at the county level, and most were public. Hundreds of people typically attended. When Henry McDonald, murderer and spinner of tall tales, was hanged in 1881 in Silver City, 300 people watched. Several thousand were present for the triple hanging of James Romain, David Renton, and Christopher Lower on the outskirts of Lewiston in 1864 for the infamous Magruder Massacre. A crowd of 300 watched Anthony McBride's hanging at Crane Gulch, 2 miles north of Boise (near the present-day site of Highlands Elementary School), in January of 1868. More than 200 people gathered for the hanging of Kuok Wah Choi in Quigley Canyon, northeast of Hailey, in 1884. *See* book entitled "Hanged, A History of Idaho's Executions," by Kathy Deinhardt Hill published in 2010.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 7

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

In 1896, the black cap that had been pulled over the head of James Ellington as he was hanged in Boise slipped off, uncovering his face as he died. The *Idaho Daily Statesman* reported the mishap as a "horrifying spectacle."

In 1899, the Idaho Legislature passed a law centralizing executions and felony punishments at the state prison. Though the legislation called on the state prison board to provide "a suitable room or place, closed from public view within the walls of the State penitentiary" for executions, that did not spell the end of media witnesses to Idaho executions.

The first execution conducted at the prison under the new rules was the hanging of murderer Ed Rice on November 30, 1901. The headline in the December 1, 1901, *Idaho Daily Statesman* read, "Ed Rice Dies on Scaffold; Walked unflinchingly from cell to gallows up the steps; Spoke not a word of his dastardly crime."

The *Statesman* reporter, and other media witnesses, were present from the moment the death warrant was read to the condemned man in his cell; walked with him and a priest from the cell to the scaffold; and reported on every detail of the execution, its lead-up, and even its aftermath, when guards placed the body in a coffin and "carried it to one of the small houses on the (prison) grounds."

The *Statesman* reported that a few minutes before 8 o'clock, prison Warden Arney "stated that only those present in a religious, official or reportical (sic) capacity could enter the cell, on account of its size, to hear the death warrant read." Those included George Wheeler of the *Capitol News*, Fred Flood of the *Statesman*, and Guy Flenner of the *Evening Bulletin*.

In his account in the *Statesman*, Flood wrote, "The body swung not to the right and left, the rope made not a single twist, but facing the sun in the eastern sky, like one standing erect, all that was mortal of Ed Rice was there before his fellows, while the tide of life fast ebbed away."

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 8

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

When James Connors was hanged on December 16, 1904, the headline in the *Idaho Daily Statesman* the next day read, "Connors Meets Death Bravely; Retains his nerve to the end and declines to make a statement; Murderer of Deputy Sheriff Sweet of Blackfoot display remarkable coolness on the gallows; Execution conducted in perfect manner by Warden Ackley."

The article reported that Connors ascended the steps of the gallows "on tiptoe in front of the guards." Asked for any final words, the paper reported that Connors responded, "I have nothing to say," speaking "in clear and unwavering tones."

In 1906, the *Statesman* reported in detail on the hanging of William Henry Hicks Bond for the murder of Charles Daly "before 23 spectators." The paper's August 11, 1906, edition reported that after the cap was placed over Bond's head and the noose around his neck, "Bond's muffled voice agonizing in its entreaty, was heard: 'God! God have mercy on my soul! Oh God hear my prayer! God hear my dying words!' ... Bond's body dropped the five feet to the end of the rope and his soul was in eternity."

This was the norm for Idaho executions, members of the news media have served as witnesses throughout the history of state executions and up to the present day. In fact, on May 8, 1909, the *Idaho Daily Statesman* published a photograph of a hand-written, elaborately lettered invitation/ticket the newspaper had received the day before from Warden John W. Snook, stating, "Admit Reporter Boise Statesman, To the execution of, Fred Seward, May 7th, at 8 O'clock a.m."

The *Capitol Evening News*, on May 7, 1909, carried the headline, "Fifty people witness execution at the State Penitentiary today," and the *Statesman* reported the next day, "No evidence of weakness was manifested until the very last when the black cap was drawn over his head. Then his whole being shuddered as though chilled by a cold blast." It also referenced "the assembled party

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 9

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

of newspaper men, officials and others who had been permitted to witness the hanging." Seward was hanged "for the murder of Clara O'Neill, a notorious woman of Moscow," according to records at the Old Idaho Penitentiary.

Similar first-person reports were published on the 1924 execution of Noah Arnold and the 1926 execution of John Jurko.

At Idaho's last hanging, the October 18, 1957, execution of Raymond Allen Snowden, a dozen witnesses entered a viewing room for the hanging in a new indoor gallows. "Several newspaper reporters were also at the execution, but all declined to enter the observation room," wrote author Kathy Deinhardt Hill in her book "Hanged, A History of Idaho's Executions," published in 2010. Prison guard Mark Maxwell, who attended the execution, told Idaho Oral History Center interviewer Kathleen Dodson in 1981, "There was two or three newspaper guys here. ... They didn't want in - they all waited out here."

Inside the viewing room, witnesses saw the condemned man, strapped to a full-length backboard, fall awkwardly through the trap door and take 15 minutes to die. Said Maxwell, "Lots of guards didn't want to be here - just like the newspapermen."

At Idaho's next execution, the 1994 death by lethal injection of Keith Eugene Wells, media witnesses included longtime *Associated Press* correspondent Bob Fick. He reported, "Inmates pounded on the walls and stomped on the floor in protest as the execution took place." Fick was among four media witnesses; he reported that Wells had no final statement. "It took longer than they had anticipated that it would take," he recalled in a 2011 interview with Boise State Public Radio's Samantha Wright. He remembered the lethal injection procedure as "sterile and antiseptic," in contrast to Wells' crime, during which Wells beat his two victims to death with a baseball bat at a

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 10

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

Boise bar. *See* "Media Witness to an Execution," 11/15/2011 interview of Bob Fick by Samantha Wright, Boise State Public Radio: http://boisestatepublicradio.org/post/media-witness-execution and *also see* "Idaho Holds First Execution in 36 Years," By Bob Fick, Associated Press Writer, Jan. 6, 1994, Google News/The Prescott Courier: http://news.google.com/newspapers?nid=886&dat=19940106&id=PrtSAAAAIBAJ&sjid=pH0DAAAAIBAJ&pg=5208,805363.

In November of 2011, Idaho executed Paul Ezra Rhoades. Four media witnesses - - Rebecca Boone of the *Associated Press*; Nate Green, *Idaho Press Tribune*; Mac King, KIVI-TV; and Ruth Brown, *Idaho Falls Post-Register* -- attended the execution. They shared their detailed observations, including the condemned man's last words, with other reporters and the public immediately afterward.

Said Boone, "He apologized for the Michelbacher murder but did not take responsibility for the other two murders." Reported Brown, "His fingers tapped and his legs fell limp before he took one last gasp of air." Green said the procedure was "very quiet and somber." He also reported that once Rhoades was dead, a friend of one of the victims muttered, "The devil has gone home." *See* Link to KTVB account of media witness statements, Paul Ezra Rhoades execution, 11/18/2011: http://www.ktvb.com/home/Paul-Ezra-Rhoades-execution-134051813.html.

The attached articles and links referenced in the Affidavit of Ms. Betsy Russell are of public record and contained in the State of Idaho's archives and F.R.E. 201 allows the above-entitled Court to take Judicial Notice of the same, and that  request is hereby made.

·

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8]  TO EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] & STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 11

Charles A. Brown, Esq.
· P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

**B.    Discussion of Idaho's Penological Objectives as to Witness Protocol.**

**1)    Applicable Standard**

The level of scrutiny applicable to the review of challenges to prison regulations measures whether that regulation bears a reasonable relation to legitimate penological objectives. *Cal. First Amend. Coalition v. Woodford*, 299 F.3d 868, 878 (9th Cir. 2002).    Alternatively, this can be described as rational basis scrutiny.  Of the three levels of scrutiny applied to evaluate the constitutionality of governmental action, rational basis is the most deferential to the government. As a result, the challenger in any contest over the validity of the governmental activity bears the burden of proof.

But it is not enough to abandon the analysis after reaching the mere conclusion that rational basis scrutiny applies.  The real key to a complete analysis rests in the recognition that those objectives pursued by a government actor must be *legitimate* objectives.  Penal institutions play a critical role in the "preservation of societal order through enforcement of the criminal law." *Procunier v. Martinez*, 416 U.S. 396, 412, 94 S. Ct. 1800, 1811, 40 L. Ed. 2d 224 (1974), ***overruled on other grounds***, *Thornburgh v. Abbott*, 490 U.S. 401, 409-414, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989).  "The identifiable government interests at stake in this task are the preservation of internal order and discipline, maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *Id*.  And so, a good reason, even though persuasive, does not necessarily equate to a legally cognizable reason that correlates to a legitimate governmental interest. The *Procunier v. Martinez* although overturned on other grounds the heart and substance of its original ruling as it applies in this matter remains intact.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8]  TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] -  12

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)