The IDOC enjoys no blank slate upon which it can unilaterally craft prison regulations in contravention of, and without regard for, the limitations and safeguards of the United States Constitution. Rather, the United States Supreme Court long ago addressed the appropriate objectives to be achieved by the promulgation of prison regulations. Those regulations must be reasonably related to a legitimate objective. *Pell v. Procunier*, 417 U.S. 817, 827, 94 S. Ct. 2800, 41 L. Ed.2d 495 (1974). Otherwise, a regulation "'represents an 'exaggerated response' to those concerns.'" *Woodford*, 299 F.3d at 878 quoting *Turner v. Safley*, 482 U.S. 78, 87, 107 S. Ct. 2254, 96 L. Ed.2d 64 (1987) quoting *Pell*, 417 U.S. at 827, 94 S. Ct. 2800.

"The 'legitimate policies and goals of the corrections system' are deterrence of future crime, protection of society by quarantining criminal offenders, rehabilitation of those offenders and preservation of internal security." *Woodford*, 299 F.3d at 878 quoting *Pell*, 417 U.S. at 822-23. "It is in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners." *Pell*, 471 U.S. at 823. Although, according to *Pell*, the exaggerated response test was originally intended to treat the rights of prisoners, the Ninth Circuit has applied it to restrictions placed upon the rights of those outside prison walls, but affected by the policies of prison officials. *Woodford*, 299 F.3d at 879. And so, the IDOC possesses no deferential entitlement to ignore the mandates of either the United States Supreme Court or the United States Constitution.

Another consideration in assessing the validity of government action which inhibits the exercise of a right rest upon the availability of alternative means by which to effect that right. "Because witnesses cannot see first-hand the manner in which the intravenous lines are injected, they will not be privy to any complications that may arise during this initial invasive procedure. *Id.* at

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] & STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 13

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

883. Because no alternative exists to direct observation of the preparatory stages involved with an execution, the shielding of this phase "entirely eliminates independent, public eyewitness observation of several critical steps of the execution process." *Id.* The public is forced to rely on information provided them by prison officials. *Id.* These officials may well harbor an interest in withholding details of the execution process that, in their opinion, might appear unseemly, unsavory or damaging to the reputation of the prison and its officials. The lack of available alternative avenues to ascertain information on a topic of paramount public importance represents a critical factor in assessing the legitimacy of governmental restrictions that impair the exercise of constitutional rights.

### 2) The Penological Objectives Advanced by the IDOC Lack Legitimacy

The IDOC advances four underlying objectives to support the validity and authority of IDOC Standard Operating Protocol 135. It asserts that these various rationales reflect "legitimate penological objectives." Yet, although such a description would otherwise connote conformance with the determination of the United States Supreme Court on the matter of legitimate penological interests, no basis exists in the Court's decisional jurisprudence for any of these supposed legitimate objectives.

This requirement that regulatory action by prison administration conform to penological objectives established by judicial precedent, and thereby established as legitimate, serves as a significant limitation imposed on the discretion of prison authorities. For example, the California Department of Corrections defended a regulation which allowed the screening of both incoming and outgoing mail on the basis that censorship of prisoner mail was "'within the discretion of prison administrators.'" *Procunier v. Martinez*, 416 U.S. 396, 416, 416, 94 S. Ct. 1800, 1812, 40

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 14

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

L. Ed. 2d 224 (1974) *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989) citing Brief for Appellants 21. "[T]he heart of appellants' position is not that the regulations are justified by a legitimate governmental interest but that they do not need to be." *Martinez*, 416 U.S. at 415, 94 S. Ct. 1800, 1812, 40 L. Ed. 2d 224 (1974) overruled by Thornburgh v. Abbott, 490 U.S. 401, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989). In the end, "the Department's regulations authorized censorship of prisoner mail far broader than any legitimate interest of penal administration." *Id.* at 416. Unlike the California Department of Corrections, the IDOC apparently recognizes the need for a legitimate governmental interest to justify Standard Operating Protocol 135. However, IDOC's mere awareness of this constitutional prescription neither excuses ignorance of its underlying substance nor confers authority upon the Department to fashion or fabricate self-styled "legitimate penological objectives" tailored for convenience.

First, the IDOC maintains in its brief that preserving the condemned inmate's "right to privacy during as much as possible of his final conscious moments" represents a legitimate penological interest. See page 6 of Defendants' Opposition brief. However, "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Pell*, 417 U.S. at 822. "[S]imply because prison inmates retain certain constitutional rights does not mean these rights are not subject to restrictions and limitations." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877, 60 L. Ed. 2d 447 (1979). And, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* So, the constitutional rights of prisoners are narrower in scope than those enjoyed by the public at large. *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). Prisoners remanded to the IDOC forfeit

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] & STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 15

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

entitlement to the unfettered exercise of individual liberties. *State v. Brandt*, 135 Idaho 205, 207, 16 P.3d 302 (Idaho App. 2000); *see also Lewis v. Casey*, 518 U.S. 343, 346 (1996). "A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Bell v. Wolfish*, 441 U.S. at 546. A prisoner's right to privacy is no exception.

The United States Supreme Court has considered a prisoner's right to privacy in the context of a Fourth Amendment challenge to a regulation that prevented prisoner observation of unannounced living quarter searches. Although prior decisions had invalidated the room-search rule, the Court reasoned that "[i]t may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell." *Id.* at 556. "[G]iven the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope." *Id.* at 557. Incarceration necessarily curtails the rights and privileges otherwise exercised by free individuals. The assertion by the IDOC that a condemned prisoner retains a right to privacy of such degree to warrant its preservation, and one which deserves protection as a legitimate penological objective of the Department, seems incredulous. Unless prisoners committed to the Idaho penal system enjoy a level of privacy substantially similar to that enjoyed by individuals outside prison walls, the IDOC must recognize the contradiction inherent within its position.

Second, the IDOC argues that "considering how an extended witness period may affect other death row inmates" constitutes a legitimate penological interest. See page 7 of Defendants' Opposition brief. But the fact that a condemned prisoner may not wish for their execution to be sensationalized, or be made into a spectacle, is not a legitimate penological interest recognized by the Supreme Court. In fact, such a conciliatory approach to the sensitivities of the

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] & STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 16

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

inmate population serves only to thwart the primary penal goal to deter future crime. Under the guise of protecting inmate sensibilities, the IDOC seeks to mute the impact of the execution process on the general public and thereby avoid potentially negative controversy. What's more, the IDOC argument does not arise from any concern over maintenance of the internal order and security of the institution.

Third, the IDOC proposes that a legitimate penological interest lay in "shielding the family and friends of the condemned inmate from the public suffering that the inmate might incur during extended witness periods or delays in the execution process." Yet pursuit of this interest not only saves the family and friends of the prisoner from witnessing any potential suffering of the condemned during the execution procedure, but blinds the public at large from the harsh reality that accompanies death by execution. To be certain, "[i]t is critical for the public to be reliably informed about the lethal injection method of execution." *Woodford*, 299 F.3d at 884. Witness attendance at an execution assures public involvement in the process, and transparency fuels "informed public debate," which "is the main purpose for granting a right of access to governmental proceedings." *Id.* The IDOC makes speculative assertions with no empirical support.

A prison regulation or practice that restrains First Amendment rights "must further an important or substantial governmental interest unrelated to the suppression of expression." *Martinez*, 416 U.S. at 413. Referencing the censorship of mail by prison authorities, the Supreme Court has determined that the practice may not be employed "simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial government interests of security, order, and rehabilitation." *Id.* That logic applies by analogy to implementation of IDOC Standard

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 17

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

Operating Protocol 135, which purposely censors and conceals a critical stage of the execution process in order to achieve a sanitary result for consumption by the general public. The IDOC may not shroud the execution process from the public eye simply to avert unfavorable criticism, avoid negative press or control damage to the Department's reputation.

Fourth, IDOC argues that protecting the identity of Medical Team members is a legitimate interest. In fact, since this argument relates closely to the recognized penological goal of preserving security within the institution, it appears strongest. But while the IDOC emphasizes the importance of identity protection and anonymity, beyond noting a potential adverse effect on the recruitment or retention of Medical Team members, it fails to adequately explain the reason why it considers such protection so essential. One can surmise that the primary concern over identity protection finds root in the possibility of retaliation from either prisoners within the institution or the public. Regardless, the complaint in this matter has made it repeatedly clear that the Plaintiffs are not seeking the identity of the medical team or others in the execution chamber with the condemned. Said individuals are garbed in medical masks and don't have name tags and such is not being challenged herein.

The IDOC avoids addressing the issue of possible retaliation against Medical Team members because of the attitude of the Ninth Circuit toward retaliation in *Woodford*. As the Court remarked, "[E]ven assuming an execution team member were identified by a witness, the notion of retaliation is pure speculation." *Id.* at 882. In that case, the California Department of Corrections failed to show that any "execution team member has ever been threatened or harmed by an inmate or by anyone outside the prison because of his participation in an execution." *Id*. Indeed, "prison officials may pass regulations in anticipation of security problems." *Id.* citing *Casey v. Lewis*, 4 F.3d

1516, 1521 (9th Cir. 1993). But, "they must at a minimum supply some evidence that such potential problems are real, not imagined. Here, Defendants fail to explain why we should disregard the history of safety surrounding those officials whose identities have always been publicly known." *Id.* The IDOC lacks any concrete, documented evidence of retaliation that would lend support to the contention that protecting the identity of Medical Team members represents a legitimate penological interest.

3) **The Test for Regulatory Reasonableness**

In order for a regulation to be deemed reasonable, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984). Not only must the regulation be legitimate, it must also be neutral. *Id.* at 90. Strictly regarding prisoner rights, as opposed to civilians affected by prison regulations, "[w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Id.* citing *Pell*, 417 U.S. at 828; *Bell v. Wolfish*, 441 U.S. 520, 551 (1979).

Another factor relevant to the reasonableness of prison regulations which restrict a prisoner's right addresses the availability of alternative means that would allow the exercise of that right. *Id.* The potential impact, or "ripple effect," of accommodating the right on prison staff, the prisoner population and prison resources presents an important additional consideration. *Id.* Deference to a prison regulation would be appropriate only if that "ripple effect" is deemed significant. *Id.*

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 19

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

More fundamentally, the evaluation of any foreseeable "ripple effect" is confined to the context of potential detriment to prison order and security. *Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989). A threat to the internal order and security of a prison "raises the prospect of precisely the kind of 'ripple effect' with which the Court in *Turner* was concerned." *Id.* To be sure, it is nearly impossible to conceive any regulatory action undertaken by prison administration that could not somehow be construed as creating a "ripple effect" within a prisoner population. And so, protecting the "private dignity" of death row inmates from the effects or adversities that may flow from publicity surrounding an execution does not, without more, make IDOC Standard Operating Protocol 135 reasonable. Blades Decl., ¶ 6 [Dkt 8-3]. Neither do such considerations, devoid of any expressed concern for prison order and security, justify defense of the Protocol as serving a legitimate penological interest.

For purposes of the instant matter, though, which involves a prison regulation that violates the constitutional rights of civilians living outside the walls of the prison system, rather than the rights of those housed within, a fourth factor proves critical. This factor probes reasonableness by evaluating the absence, or lack of, ready alternatives that might allow the right to be accommodated. "By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* This is not, as the Supreme Court notes, a "least restrictive alternative" test. *Id.* at 90-91. "But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 20

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

So, under the *Turner* analysis, as applied by the Ninth Circuit to the rights of the public outside prison walls, and where full accommodation of the public's constitutional rights can be achieved at minimal cost to penological interests by merely drawing open the curtains of secrecy, IDOC Standard Operating Protocol 135 represents an "exaggerated response."

### 4) IDOC Protocol Presents a Consequential Restriction on the Rights of Nonprisoners

In 1974, the Supreme Court considered the standard of review appropriate for prison regulations that impair the First Amendment rights of prisoners, as well as nonprisoners, through censorship of mail. *Martinez*, 416 U.S. 396. Prisoners of the California Department of Corrections challenged a regulation which authorized screening of both incoming and outgoing letters by prison employees. Irrespective of the traditional deference afforded the judgment of prison administrators by the judiciary, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Martinez*, 416 U.S. at 405-06 citing *Johnson v. Avery*, 393 U.S. 483, 486 (1969).

The Court noted that both the author and recipient of a communication possess a First Amendment interest in uncensored correspondence, albeit in different degrees. *Id.* at 408. "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id.* Whether or not the nonprisoner party to a communication acts as the sender or recipient, "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners." *Id.* at 409. Addressing infringement of the rights of nonprisoners, the Court continued:

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 21

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

> Accordingly, we reject any attempt to justify censorship of inmate correspondence merely by reference to certain assumptions about the legal status of prisoners. Into this category of argument falls appellants' contention that 'an inmate's rights with reference to social correspondence are something fundamentally different than those enjoyed by his free brother.' This line of argument and the undemanding standard of review it is intended to support fail to recognize that the First Amendment liberties of free citizens are implicated in censorship of prisoner mail. We therefore turn for guidance, not to cases involving questions of 'prisoners' rights,' but to decisions of this Court dealing with the general problem of incidental restrictions on First Amendment liberties imposed in furtherance of legitimate governmental activities.

*Martinez*, 416 U.S. at 409 (internal citations omitted). In the context of penal institutions, only preservation of internal order and discipline, maintenance of institutional security against escape or unauthorized entry and rehabilitation justify censorship of prisoner mail. *Id.* at 412-13. And "the Department's regulations authorized censorship of prisoner mail far broader than any legitimate interest of penal administration." *Id.* at 416. So, beyond pursuit of legitimate penological objectives, restrictions that impair the rights of nonprisoners, whose freedoms have been neither forfeited nor limited by incarceration, violate the liberty protections afforded by the United States Constitution.

The *Martinez* Court analyzed the content-based correspondence regulation according to a strict scrutiny standard. *Martinez*, 416 U.S. at 413-14. Involvement of the First Amendment rights of free citizens played a critical role. The decision "turned on the fact that the challenged regulation caused a 'consequential restriction on the First and Fourteenth Amendment rights of those who are *not* prisoners.'" *Turner v. Safley*, 482 U.S. 78, 85 (1987) citing *Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974) (emphasis in original). So, "implication of the interests of nonprisoners may support application of the *Martinez* standard" simply because a consequential restriction may impair the constitutional rights of those outside the prison system. *Turner*, 482 U.S. at 97 citing *Martinez*, 416 U.S. at 409.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 22

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

Outside any articulable concerns for prison order and security, the constitutional pronouncements of *Martinez* regarding infringement of nonprisoner rights through implementation of penal regulations remain viable today. And, this viability continues despite limitation and overruling of the decision by subsequent jurisprudence on issues not relevant to the instant matter at hand. *Thornburgh*, 490 U.S. at 409-14. Where *Martinez* had originally required that regulations censoring prisoner mail be "generally necessary" to a legitimate government interest, the Court has now adopted an approach more deferential to the judgment of prison officials. 416 U.S. at 414. This revision corrects some confusion that developed as to whether *Martinez* required application of a "least restrictive alternative" analysis to regulatory action undertaken by prison administration. *Thornburgh*, 490 U.S. at 410. In addition, *Martinez* could be read as making a distinction in the treatment of incoming correspondence from prisoners and incoming correspondence from nonprisoners. *Id*. at 411-13. Because *incoming* correspondence poses a substantially greater threat to prison security than *outgoing* correspondence, the *Martinez* standard has been limited to *outgoing* mail. *Id*. at 413. Fear that "language in *Martinez* might be too readily understood as establishing a standard of 'strict' or 'heightened' scrutiny" for all discretionary action taken by prison officials drove revision. *Id*. at 410. "[S]uch a strict standard simply was not appropriate for consideration of regulations that are centrally concerned with maintenance of order and security within prisons." *Id*. at 410 (footnote omitted). So, while the application of the *Martinez* standard to the rights of nonprisoners may well be limited or inappropriate within the context of a genuine threat to prison order and security, where such a threat is absent, the *Martinez* standard of strict scrutiny applies with robust vitality.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] & STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 23

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

IDOC Standard Operating Protocol 135 imposes significant burdens on the fundamental First Amendment rights of free citizens residing outside the walls of the Idaho prison system. Although the form of the particular right at issue in this matter, the right to view, is distinct from that impaired by the censorship of mail, both fall squarely within the province of the First Amendment. Where the IDOC fails to articulate any intelligible threat, or even raise a specter of concern over the possibility of a threat, to prison order and security, a standard of strict scrutiny must apply in evaluating the constitutional propriety of the IDOC Protocol.

## V.     CONCLUSION

The Defendants argue strongly that its penological interests are to support the sensitivities of the condemned, his family, and others similarly convicted and waiting their plight on death row. The Defendants fail to point to any type of case law that supports its allegation that these convicted prisoners, who have had their Constitutional rights diminished tremendously due to their convictions and incarceration, somehow have Constitutional rights that overcome, and are more important than, the Constitutional rights of society as a whole. The position adopted by the Defendants herein flies in the face of the rationale and logic as expressed by the Ninth Circuit Court in *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 3 Med. L. Rptr. 2345 (9th Cir. 2002). For the Defendants to now argue that the condemned's sensitivities, and those of other inmates on death row, should somehow trump the Constitutional rights that free citizens have enjoyed for well over 200 years is neither supported by law nor logic.

The prayer in Plaintiffs' complaint requests this Court to "Grant a permanent mandatory injunction requiring all phases of the execution process".... "be conducted in full and open view of

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] &
STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 24

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)

the assembled witnesses to that execution." Such is necessary to comply with mandate and spirit of the First Amendment.

      RESPECTFULLY SUBMITTED on this 4th day of June, 2012.

                                                Charles A. Brown
                                                Attorney for Plaintiffs.

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on the 4th day of June, 2012, I filed the foregoing with the Clerk of the Court electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

        Michael S. Gilmore                    mike.gilmore@ag.idaho.gov
                                                  colleen.funk@ag.idaho.gov
                                                  paul.panther@ag.idaho.gov

        Mark A. Kubinski, Esq.                 mkubinsk@idoc.idaho.gov
                                                  ablades@idoc.idaho.gov
                                                  kburnett@idoc.idaho.gov

      AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participant in the manner indicated:

        Thomas C. Perry, Esq.                via facsimile to: 208-334-3454
        Office of the Governor

                                                Charles A. Brown

PLAINTIFFS' RESPONSE TO DEFENDANTS' OPPOSITION [DKT8] TO EXPEDITED MOTION FOR PRELIMINARY INJUNCTION [DKT2] & STATUTORY SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, DKT. NO. 2 [DKT 11] - 25

Charles A. Brown, Esq.
P.O. Box 1225/324 Main St.
Lewiston, Idaho 83501
208-746-9947/208-746-5886 (fax)